**UNITED STATES of America, Plaintiff,**

v.

**Richard S. CANNISTRARO, Defendant.**

**Crim. No. 87–193.**

United States District Court,
D. New Jersey.

April 12, 1990.

Robert P. Warren, Asst. U.S. Atty., Office of the U.S. Atty., Newark, N.J., for government.

Robert B. Kurzweil, Katz, Lane, Ettin, Levin & Kurzweil, Cherry Hill, N.J., for defendant.

LECHNER, District Judge.

Richard S. Cannistraro ("Cannistraro") has filed this motion pursuant to Fed.R. Crim.P. 32(d) to withdraw his guilty plea to all nine counts of the indictment in *United States v. Cannistraro*, Crim. No. 87–193 (the "First Indictment" [1]). Cannistraro claims he would not have pleaded guilty to the First Indictment but for the ineffective assistance of his former trial counsel. He further claims his testimony at the plea allocution did not establish an adequate factual basis for acceptance of his guilty plea and his plea was accepted under circumstances which materially deviated from the requirements of Fed.R.Crim.P. 11. For the reasons which follow, Cannistraro's motion to withdraw the plea is denied.

## BACKGROUND

The First Indictment, which was filed on 28 May 1987, charged Cannistraro with nine substantive criminal offenses: conspiracy to commit securities fraud (count one), creation and use of false nominee accounts in connection with the purchase and sale of securities (counts two–five) and creation and distribution of false and misleading research report in violation of section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934, 18 U.S.C. § 371 (count six). In addition, Cannistraro was charged with interstate transportation of money taken by fraud in violation of 18 U.S.C. § 2314 (count seven), mail fraud in violation of 18

---

**1.** Cannistraro was subsequently indicted, along with Leo Eisenberg and Richard Bertoli in *Unit-* *ed States v. Cannistraro*, Crim. No. 89–218 (the "Superseding Indictment").

U.S.C. § 1341 (count eight), and obstruction of the grand jury investigation in violation of 18 U.S.C. § 1503 (count nine).

The First Indictment charged that Cannistraro manipulated the price of securities of Liquidation Control, Inc. ("LCI") and Toxic Waste Containment, Inc. ("TWC"), in concert with Bynum Vickory ("Vickory"), portfolio manager of the Bullock Fund, and William Fritz ("Fritz"), portfolio manager of the M & I Fund (collectively the "Funds").[2] Cannistraro agreed with Vickory and Fritz that they would direct the Funds to purchase large amounts of stock in LCI and TWC. As an inducement for the cooperation of Vickory and Fritz, Cannistraro promised to use his influence with principals of LCI and TWC to have stock issued to Vickory and Fritz.

Cannistraro set up false nominee accounts at Monarch Funding, Inc. ("Monarch") in the names of his father, his aunt and two other people for the purpose of concealing the interests of Vickory and Fritz in LCI and TWC. In addition, Cannistraro was a partial beneficial owner of stock in those companies in the nominee accounts and knew he would personally benefit from the purchase of those companies by the Funds. In furtherance of this conspiracy, Cannistraro drafted a false and misleading research report favorably evaluating TWC for Wood Gundy, Inc. ("Wood Gundy"), where he was a securities analyst. Cannistraro also bribed a grand jury witness, Carl Alan Key ("Key"), to lie under oath about Cannistraro's involvement with the nominee stock accounts.

Cannistraro was arrested on 15 May 1987 and released after posting $125,000 in cash and a bond. He retained David W. O'Connor ("O'Connor") and Marvin Gersten ("Gersten") (collectively "trial counsel") to represent him in his defense. Trial counsel entered an appearance at Cannistraro's arraignment on 12 June 1987, when he pleaded not guilty to all counts of the First Indictment. Also on that date, an order was filed directing for discovery and setting the return date for pretrial motions and the trial date. See Order for Discovery and Inspection, filed 12 June 1987. Cannistraro was not detained pending trial. See Order Setting Conditions of Release, filed 16 June 1987.

On 18 June 1987, trial counsel filed motions for disclosure of witness lists and discovery pursuant to Fed.R.Evid. 404(b), *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). See Notice of Motion, filed 18 June 1987. Cannistraro subsequently withdrew the motion for disclosure of witness lists. See Minutes of Proceedings, filed 20 July 1987. An order was entered on 20 July 1987 denying Cannistraro's motions. The Government represented it would turn over Jenks Act material seven days in advance of trial, turn over Rule 404(b) evidence three days prior to trial, continue meeting its *Brady* and *Simmons* obligations and turn over handwriting exemplars. See Order, filed 20 July 1987.

After the pretrial motion practice,[3] on or about 16 September 1987 Cannistraro's trial counsel advised the court of Cannistraro's intention to plead guilty to all nine counts of the First Indictment. Soon thereafter, the Government submitted a letter to the court setting forth the legal and factual bases necessary to establish Cannistraro's guilt on each count of the First Indictment. See Letter of Robert P. Warren, A.U.S.A., dated 18 September 1987 ("18 September 1987 Letter").[4]

On 21 September 1987, Cannistraro pleaded guilty to counts one through nine of the First Indictment without the benefit

---

**2.** Vickory and Fritz were not charged with criminal conduct in the First Indictment or the Superseding Indictment.

**3.** An number of other orders were entered relating to scheduling, administrative and discovery matters. They are not relevant for purposes of this discussion.

**4.** The 18 September 1987 Letter is a single spaced, twelve page letter which covers the legal and factual bases for each of the nine counts of the First Indictment.

of a plea agreement with the Government. A proceeding was held pursuant to Rule 11 of the Federal Rules of Criminal Procedure (the "Rule 11 proceeding"), at which Cannistraro testified under oath. *See* Transcript of Proceedings, dated 21 September 1987 ("Rule 11 Tr.").

At the Rule 11 proceeding, Cannistraro was questioned extensively by the court and Assistant United States Attorney Robert P. Warren ("Warren") regarding the voluntariness of and factual basis for the entry of the guilty plea. Cannistraro was found to be competent to enter the plea and it was determined his testimony established an adequate factual basis to accept the guilty plea. Rule 11 Tr. at 56–57.

Cannistraro testified under oath at the Rule 11 proceeding that he had reviewed the First Indictment and discussed its contents with his attorney. Cannistraro stated his attorney explained the charges, the elements of each crime and the penalties for each crime listed in counts one through nine of the First Indictment.[5] *Id.* at 8–9. In addition, Cannistraro testified he was satisfied with the representation of his attorney, *id.* at 9, and no promises, threats or arrangements had been made concerning his plea or possible sentence. *Id.* at 21–22.

Cannistraro stated he knew that by entering the plea of guilty to all counts of the First Indictment he was exposing himself to a maximum term of fifty years in prison. *Id.* at 20. He also acknowledged he could be fined up to $76,000 as provided by statute or alternatively fined up to $250,000 or twice the gain to him or loss to his victims. *Id.*

Regarding the factual basis for his guilty plea, Cannistraro read the following statement which he prepared in collaboration with trial counsel in advance of the Rule 11 proceeding:

I am pleading guilty to the counts in this indictment.

As to count number one, I agreed with Bynum Vickory and Bill Fritz that they would commit their respective funds to purchase Liquidation Control and that the M & I Fund and the Bullock Funds would likely be purchased [sic] of Toxic Waste Inc. in the open market.

As an inducement for the purchase of Liquidation Control, they or their nominees would each be allocated stock in Toxic Waste on the initial public offer of Toxic Waste.

I aided and abetted them in setting up the nominee accounts at Monarch Funding and helped them get their nominee [sic] allocated shares of Toxic Waste in the initial public offer. I knew that it was likely that the purchase of Liquidation Control by a fund would have the likely affect of increasing the value of the shares of Liquidation in the open market and that as a beneficial owner of outstanding shares of Liquidation, that I would likely benefit from the funds purchases of Liquidation.

As to count number two, I assisted in the opening of a nominee account in the name of Mary Godano in which account I had a partial beneficial interest.

I used this account to purchase Liquidation Control Incorporated stock on the initial public offer. I was able to get allocations of the initial offer in Liqui-

---

5. O'Connor made particular mention of the fact that he had discussed the likelihood of conviction with his client:

Can I say for the record that in terms of count seven and eight, I've particularly advised Mr. Cannistraro that—let me check that. Counts six, seven and eight, that all three of those counts he could have been found guilty on *Pinkerton* theory, since they were acts as part of the conspiracy. And as you ask him particular questions, it will become clear as to interstate commerce or whatever, he doesn't know. *All he knows is that it was a likely end result of this overall role in the conspiracy itself.*

Rule 11 Tr. at 29 (emphasis added). Under *United States v. Pinkerton,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), having admitted a role in the conspiracy, Cannistraro could be convicted of the substantive crimes committed by his co-conspirators in furtherance of the objects of the conspiracy. *Id.* at 646, 66 S.Ct. at 1183.

The 18 September 1987 Letter also discusses the elements of the crimes charged in each count, the penalties for each crime, including incarceration and fines, the appropriate mandatory assessments and restitution as well as a proposed series of questions for each count to establish the required factual basis for the plea.

dation due to my prominent role in the company and my personal business relationship with the president of Monarch, Leo [Ei]senberg [sic]. Even though I was an insider, I failed to disclose this in the prospectus on Liquidation Control's initial public offer.

As to count number three, with my assistance Edward Cannistraro, my father, set up an account at Monarch in which I had a partial beneficial interest at Monarch. I was instrumental in getting an allocation of Liquidation Control stock at the public offer. I failed to disclose this in the prospectus on Liquidation Control's initial public offer.

As to count number four, I set up a nominee account for myself at Monarch Funding in the name of Donna Lee Clarambeau. In this account, Toxic Waste stock was purchased by me under the initial public offer. Since I had a personal business relationship with the president of Monarch, Leo [Ei]senberg [sic], I was able to obtain an allocation in the initial offer of Toxic Waste. I did not disclose this nominee account to the public and, specifically, I did not disclose the nominee account in my research report.

As to count number five, I set up a nominee account for myself at Monarch Funding in the name of Carl Alan Key. In this account also Toxic Waste stock was purchased by me under the initial public offer. I did not disclose this fact to the public and, specifically, I didn't disclose this nominee account in my research report.

As to count number six, I sent the Wood Gundy research report on Toxic Waste to Ground Floor, hoping it would be used in Ground Floor's publication.

I failed to advise them [sic] that I had not disclosed a certain nominees [sic] of mine purchased stock in Toxic Waste on the initial public offer. Moreover, I did not disclose my position at Liquidation Control Company, many whom [sic] officers were officers of Toxic Waste, nor did I disclose the arrangement with Bill Fritz and Bynum Vickory.

As to count number seven, I aided and abetted Bynum Vickory in opening up an account at Monarch for his nominee. I was aware of the fact that as part of the conspiracy in count number one, there would never be a transfer of money to the account, Vickory's nominee at the time of a sale by Vickory's nominee of Toxic Waste stock and that this transfer would likely be made using interstate commerce.

As to count number eight, when M & I Bank purchased the stock as part of the conspiracy in count number one, I knew that Continental Transfer Company was the transfer agent for Liquidation Control Incorporated and Toxic Waste and, therefore, there would likely be communication using the mails between Continental Transfer and the M & I Bank.

As to count number nine, I paid Carl Alan Key's legal fees by giving him cash payments so he could pay those fees. This was agreed upon, since I believed it unfair for him to pay such legal fees, since he was my nominee and his fees arose because of that fact.

Although Carl Alan Key told me he received a subpoena and he was going to talk to Government officials, I do not know if, in fact, he actually went before the Grand Jury. Carl Alan Key, a close friend since college and I sat down to discuss the events leading up to his purchase of the Toxic Waste stock. In establishing the scenario, we put my role in the best possible light which was not accurate, in fact.

*Id.* at 25–29. Cannistraro testified he had reviewed the statement with his attorney and it was an accurate, true and correct account of his conduct. *Id.* at 24–25.

Following the reading of Cannistraro's statement, the Assistant United States Attorney further inquired into the factual basis for the guilty plea by questioning Cannistraro regarding his alleged criminal conduct on each element of each count of the First Indictment. Warren read from a list of eighty-nine questions prepared by the

Government and contained in the 18 September 1987 Letter.[6] Rule 11 Tr. at 30–55. Cannistraro denied or equivocated in answer to some of the questions posed by the Government. However, his proffer as a whole established an adequate factual basis to accept the plea of guilty to all counts of the First Indictment. *Id.* at 57.

At the end of the Rule 11 proceeding, Cannistraro was again asked whether he wished to plead guilty; he responded affirmatively.[7] The court set forth its findings on the record:

Now, based upon the testimony that I've heard today, based upon the answers to the questions and the statements that you gave without questions, it's my determination that you were competent to enter the plea; that you were adequately represented by counsel and that you were aware of the charges in the indictment. You understood each of the elements of the charges in the indictment; that there was no plea [agreement], there was no promise, no inducement, no threat in order to have you come here and enter the plea. You did so on your own accord.

That you understand your constitutional rights and you knowingly and voluntarily waived your constitutional rights understanding the penalties, monetary and imprisonment type penalties which could attach.

You gave an adequate factual basis.

Accordingly, I'll accept the plea and adjudge you guilty of each count of the indictment.

*Id.* at 56–57.

On 24 September 1987, a detention hearing was held and Cannistraro was allowed to remain free on bail pending sentence, but the amount of his bail was increased by $450,000 to $575,000. Cannistraro posted municipal bonds and certificates of deposit amounting to approximately $450,000 in satisfaction of bail. *United States v. Cannistraro,* 694 F.Supp. 62 (D.N.J.1988), *aff'd in part and remanded,* 871 F.2d 1210 (3d Cir.1989).

At a 2 November 1987 sentencing hearing, facing a maximum sentence of fifty years in prison, Cannistraro was sentenced to a total of eight years in prison and five years of probation. In addition, he was fined $330,000 and was ordered to pay $394,947[8] in restitution to his victims. *Cannistraro,* 694 F.Supp. at 67.

Following the sentencing, Cannistraro filed motions for reduction of his sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure and for the return of assets posted as bail. Cannistraro's post-trial motions were denied on 5 April 1988. On motion by the Government, the assets posted as bail were turned over to the trustee appointed to effect restitution to Cannistraro's victims. *Id.* at 78.

After the denial of Cannistraro's Rule 35 motion, he retained new counsel, Bruce M. Merrill ("Merrill"), and appealed to the

---

**6.** Defense counsel David W. O'Connor objected at the beginning of the Rule 11 proceeding to certain of the questions involving events not relating to the First Indictment. Rule 11 Tr. at 11. O'Connor agreed to proceed with the Rule 11 proceeding and object where appropriate. *Id.* Where O'Connor objected, questions were not asked. *See id.* at 40, 42 and 43.

**7.** The final questions and answers are recorded as follows:

BY THE COURT:
Q  All of what you've given me here today is true and accurate?
A  Yes.
Q  And all of these facts that you've given me reflect a willful, knowing and intentional participation on your part as reflected in your testimony?

A  Yes, your Honor.
THE COURT: Anything else?
MR. WARREN: No, your Honor.
Q  Now, in light of all the questions I've asked you, in light of all the questions the Government has asked you, in light of the statements of your attorney, statements of the Government, did you still wish to enter a plea of guilty in this matter?
A  Yes, your Honor.
Q  And how do you plead, guilty or not guilty?
A  I plead guilty.
Rule 11 Tr. at 56.

**8.** The original sentence fined Cannistraro $394,-847 but that figure was amended due to an arithmetic error.

Third Circuit. On 6 April 1989 the Third Circuit affirmed the denial of the return of bail monies and the restitution imposed in conjunction with the sentence. *Cannistraro,* 871 F.2d at 1211, 1214. However, the Circuit vacated the term sentence of imprisonment based on supplements to the record which were not before the court at the time of sentencing. The supplemented record showed that the opinion denying the Rule 35 motion mischaracterized a statistical list of average sentences which was contained in the presentence report. *Id.* at 1216.

The matter was remanded for a determination of whether the statistics were relied on in sentencing Cannistraro and for resentencing in light of the supplemented record. Significantly, the Third Circuit stated the identical sentence of imprisonment could be reimposed if the list of average sentences was not relied on in formulating the sentence of imprisonment. *Id.* at 1217. At a hearing on 5 May 1989 regarding the Third Circuit's opinion, I stated that I did not rely on the table of average sentences contained in the presentence report in imposing the eight year term of incarceration on Cannistraro. *See* Transcript of Proceedings, 5 May 1989, ("5/5/89 Tr.") at 3.

Approximately two weeks after the Third Circuit remanded the case for resentencing—and one and one-half years after the Rule 11 proceeding and sentencing—Cannistraro filed a motion to withdraw his guilty plea pursuant to Rule 32(d) of the Federal Rules of Criminal Procedure (the "Rule 32(d) motion"). *See* Notice of Motion, filed 21 April 1989. For purposes of the Rule 32(d) motion, Cannistraro is represented by Robert B. Kurzweil ("present counsel").

In support of the Rule 32(d) motion, Cannistraro filed a nine page affidavit which, in twenty separately numbered paragraphs, presents a panoply of allegations challenging the effective assistance of trial counsel.[9] *See* Affidavit of Richard Cannistraro, filed 3 May 1989 ("Cannistraro Aff."). Cannistraro also contends he pleaded guilty to conduct which was not criminal under federal law. *Id.*

The Government and Cannistraro submitted briefs with respect to the claim that Cannistraro did not establish an adequate factual basis at the Rule 11 proceeding to accept his guilty plea.[10] Regarding the ineffective assistance of counsel portion of the Cannistraro affidavit, evidentiary hearings were commenced on 24 July 1989.[11] On that date, present counsel called O'Connor and Gersten as witnesses and conducted a detailed direct examination of each witness regarding the claims of ineffective assistance of counsel. Following the testimony of these witnesses, present counsel rested on behalf of Cannistraro, who was not called as a witness. Transcript of Proceedings held 24 July 1989 ("7/24/89 Tr.") at 137–38.

Significantly, after having had an opportunity to hear the testimony of O'Connor and Gersten, Cannistraro decided not to testify in support of the serious allegations he made against them in his affidavit. Cannistraro thus did not subject himself to cross-examination regarding those allegations. Instead, he merely offered his affidavit as evidence of his complaints of ineffective assistance of counsel. At the evidentiary hearing, Cannistraro affirmatively acknowledged that he had considered the circumstances and concluded he should not

---

**9.** Cannistraro does not challenge the effectiveness of his trial counsel in any way subsequent to the Rule 11 proceeding. *See* Transcript of Proceedings, dated 28 June 1989, at 9–10. Therefore, portions of the Cannistraro affidavit which relate to the conduct of counsel subsequent to the Rule 11 proceeding are not relevant to this motion.

**10.** *See* Defendant's Brief in Support of Rule 32(d) Motion to Withdraw Plea, dated 27 April, 1989 ("Cannistraro Initial Brief"); Memorandum of Law in Opposition to Defendant's Rule

32(d) Motion, dated 15 May 1989 ("Government Opposition Brief"); Reply Brief to the Government's Memorandum of Law in Opposition to Defendant's Rule 32(d) Motion, dated 11 July 1989 ("Cannistraro Reply Brief").

**11.** The hearings concerned only Cannistraro's claim that he was denied effective assistance of counsel at the Rule 11 proceeding. Present counsel expressly represented he would not request a hearing regarding the adequate factual basis portion of the Rule 32(d) motion.

testify. *Id.* at 137–38. On questioning by the court, Cannistraro stated he understood that negative inferences could be drawn from his failure to testify. *Id.* at 138.

The Government and present counsel were requested to brief the issues of whether the affidavit should be considered in the absence of supporting testimony and whether the Rule 32(d) motion retained any viability. *Id.* at 142, 148. The evidentiary hearing was recessed without date, pending the receipt and consideration of the parties' submissions,[12] and subject to the Government's right to present additional evidence. *Id.* at 149.

After raising the question whether the Rule 32(d) motion retained any validity without Cannistraro's testimony, *id.* at 146, the Government originally did not oppose continuing the Rule 32(d) hearing. *See* 21 August 1989 Letter. Subsequently, the Government represented it would not offer additional evidence and would oppose continuing the Rule 32(d) motion. *See* Letter from Robert B. Kurzweil, Esq., dated 16 October 1989. Present counsel then stated he would review the status of the Rule 32(d) hearing with Cannistraro and would make a motion to reopen his case in chief if additional evidence were sought to be introduced. *Id.*

Present counsel did in fact make a request to reopen the Rule 32(d) hearing. A letter, dated 18 October 1989, from present counsel indicated he intended to present additional affidavits and the live testimony of witnesses, including Gary Wolff, Esq. ("Wolff"), Peter J. Blake, Jr. ("Blake") and Glenn S. Waldron ("Waldron"), on the issue of whether the pretrial investigation of trial counsel had been adequate. *See* Letter, from Robert B. Kurzweil, Esq, dated 18

October 1989 (the "18 October 1989 Letter"). Present counsel included with the 18 October 1989 Letter a notice of motion to reopen the evidentiary hearing and requested at least two weeks to notify potential witnesses. *Id.* The motion to reopen was unopposed and was granted. However, present counsel did not submit a form of order on this point until 8 December 1989; the order was signed on that date.

After a delay due to problems with scheduling the witnesses, the Rule 32(d) hearing was reopened on 1 February 1990. On that date, Wolff and Blake testified and were cross-examined by the Government. Waldron asserted his fifth amendment right not to testify, but a proffer of his testimony was read into the record. *See* Transcript of Proceedings, dated 1 February 1990 ("2/1/90 Tr."), at 85–91.

The evidentiary hearings were continued on 8 February 1990. On that date, the Government called O'Connor for cross-examination and present counsel conducted redirect examination of O'Connor. The Government offered into evidence fifty exhibits and Cannistraro offered four. Both Cannistraro and the Government rested their cases. Again, Cannistraro did not testify. *See* Transcript of Proceedings, dated 8 February 1990 ("2/8/90 Tr.").

At the conclusion of the 8 February 1990 hearing, the court directed that the Government and present counsel submit proposed findings of fact and conclusions of law regarding the ineffective assistance of counsel claim. These submissions were received in mid-March 1990.[13]

## DISCUSSION

As noted previously, Cannistraro's motion to withdraw his guilty plea is based on

---

12. Cannistraro submitted Defendant's Memorandum of Law Concerning Whether his Affidavit Should be Considered and Whether his Motion to Withdraw his Guilty Pleas is Viable Without his Testimony at the On–Going Evidentiary Hearing, dated 6 August 1989 ("Cannistraro Viability Brief"). In opposition, the Government submitted a letter in lieu of a memorandum of law, dated 21 August 1989 ("21 August 1989 Letter").

13. The Government submitted The Government's Proposed Findings of Fact and Conclu-

sions of Law in Connection with Defendant's Rule 32(d) Motion, dated 15 March 1990 ("Government Proposed Findings"). Cannistraro submitted Defendant's Proposed Findings of Fact and Conclusions of Law Concerning his Claim of Ineffective Assistance of Trial Defense Counsel, dated 19 March 1990 ("Cannistraro Proposed Findings") and Defendant's Pro Se Memorandum of Law Concerning Asserted Rule 11 Violations, dated 19 March 1990 ("Cannistraro Pro Se Brief").

two alternative grounds. He claims he would not have pleaded guilty to the First Indictment but for the alleged ineffective assistance of trial counsel. In addition, Cannistraro argues his conduct did not violate federal securities law despite his sworn testimony to the contrary at the Rule 11 proceeding.

### A. The "Fair and Just" Standard

■ A defendant who has pleaded guilty to a crime in federal court may not withdraw the plea as a matter of right. *Government of Virgin Islands v. Berry,* 631 F.2d 214, 219 (3d Cir.1980). Permission to withdraw a guilty plea is a "privilege," within the discretion of the district court. *Id.* (citing *United States v. Vallejo,* 476 F.2d 667, 669 (3d Cir.1973); *United States v. Stayton,* 408 F.2d 559, 561 (3d Cir.1969)). The court's decision to deny a motion to withdraw a guilty plea may not be overturned on appeal absent an abuse of discretion. *United States v. Huff,* 873 F.2d 709, 712 (3d Cir.1989) (citing *United States v. Trott,* 779 F.2d 912, 915 (3d Cir.1985)); *Berry,* 631 F.2d at 219–20.

■ A defendant moving to withdraw his guilty plea prior to sentencing has the burden of coming forth with a "fair and just reason" why his plea should not stand. Rule 32(d) Fed.R.Crim.Pro.;[14] *Huff,* 873 F.2d at 712; *Trott,* 779 F.2d at 915. Generally, permission to withdraw a plea prior to sentencing "should be granted more liberally than ... after sentencing." *Trott,* 779 F.2d at 915. Once a sentence has been imposed, "a plea may be set aside only on direct appeal or by motion under 28 U.S.C. § 2255." Fed.R.Crim.P. 32(d). Section 2255 provides a means of collateral attack on a sentence. However, a motion under that statute will be granted only if the sentence results in "a fundamental defect which inherently results in a complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair procedure." *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962). *See United States v. Timmreck,* 441 U.S. 780, 783, 99 S.Ct. 2085, 2087, 60 L.Ed.2d 634 (1979).

Cannistraro argues, although he was sentenced once already, the instant motion must be considered under the pre-sentencing standard of Rule 32(d) rather than under section 2255 because the eight year sentence of imprisonment was vacated on appeal and remanded for reimposition of sentence. Cannistraro Initial Brief at 3. In support of this argument, Cannistraro relies on the decisions of two courts which applied the pre-sentencing standard after a sentence was vacated on appeal. *See, e.g., United States v. Allen,* 668 F.Supp. 969, 972 (W.D.Pa.1987) (applying "fair and just" standard after sentence was vacated on appeal), *aff'd mem.,* 845 F.2d 1016 (3d Cir. 1988); *United States v. Messer,* 647 F.Supp. 704, 706 (D.Mont.1986) ("Because the sentence previously imposed has been vacated, the Court will treat the case procedurally as if sentence had never been imposed, and thus will consider the motion pursuant to Rule 32(d)."). The Government has not taken issue with this argument.

Cannistraro's argument, however, is not entirely persuasive. The circumstances of this case suggest Cannistraro should be held to a higher standard than that provided by Rule 32(d). First, the rule clearly states the "fair and just" standard applies in three instances: prior to sentencing, where the sentence was suspended or where disposition was had pursuant to 18 U.S.C. § 4205(c).[15] Fed.R.Crim.P. 32(d).

**14.** For offenses committed prior to 1 November 1987, as is the case here, Rule 32(d) provided:

> If a motion for withdrawal of a plea of guilty or *nolo contendere* is made before sentence is imposed, imposition of sentence is suspended, or disposition is had under 18 U.S.C. § 4205(c), the court may permit withdrawal of the plea upon a showing by the defendant of any fair and just reason. At any later time, a plea may be set aside only on direct appeal or by motion under 28 U.S.C. § 2255.

Rule 32(d) was amended in 1987, but the changes were technical. No substantive difference was intended. *See* Fed.R.Crim.Pro. 32(d), Notes of the Advisory Committee on Rules, 1987 Amendment to Rule 32.

**15.** This statute provided for commitment of a defendant to the custody of the Attorney Gener-

None of those situations exists in this case. Under Rule 32(d), the standard of section 2255 is to be applied "[a]t any later time." *Id.* Thus, a literal reading of the statute dictates against application of the "fair and just" standard.[16]

Second, this case does not involve a situation in which the sentence was vacated in its entirety on appeal. The Circuit affirmed the restitution ordered in conjunction with the sentence of imprisonment. The imposition of fines was not a subject of the appeal. Thus, only one part of the three part sentence was vacated; the other two portions of the sentence were not affected by the Circuit's decision. Simply put, Cannistraro is not in the same position as he was before imposition of sentence. *Cf. Allen,* 668 F.Supp. at 971 (entire sentence vacated on appeal); *Messer,* 647 F.Supp. at 705–06 (same). Rather, Cannistraro is merely awaiting resentencing on one of the three parts of the original sentence—the term of imprisonment. The decision of the Third Circuit which vacated the sentence of imprisonment specifically provided for imposition of the same sentence on remand. *Cannistraro,* 871 F.2d at 1217.

Finally, resentencing in this case will not involve further substantive fact findings. An additional presentencing report and sentencing hearing will not be necessary. Under the instructions of the Third Circuit, the resentencing of Cannistraro will involve only the factual determination of whether the statistical list of average sentences was relied upon in imposing the original sentence nearly two years ago. *Cannistraro,* 871 F.2d at 1216. As noted previously, this determination has been made and stated on the record. The statistical computation

was not relied upon in imposing the eight year term of imprisonment on Cannistraro. 5/5/89 Tr. at 3. Accordingly, there are no further factual determinations to be made prior to resentencing.

In the *Allen* case, the district court accepted a guilty plea and imposed a sentence of imprisonment which was vacated on appeal.[17] *Allen,* 668 F.Supp. at 971. Immediately after the appellate court vacated the sentence, Allen filed a Rule 32(d) motion to withdraw his guilty plea on the grounds that he was denied effective assistance of counsel and that the plea was not knowingly and voluntarily entered.

Allen argued his motion should be decided under the less stringent standard of Rule 32(d). The district court declined, however, to decide whether the Rule 32(d) standard was applicable in light of the fact that the sentence was vacated on appeal. Rather, the court simply stated Allen had not presented a fair and just reason to withdraw the plea and denied the motion on that ground. *Id.* at 972. Read in light of this, the *Allen* case is not supportive of Cannistraro's position that the "fair and just" standard of Rule 32(d) is applicable to this case.

Although there are serious doubts as to the applicability of the Rule 32(d) "fair and just" standard to this motion, the analysis will proceed under the Rule 32(d) standard for the sole reason that the Government has not objected to its application. As in *Allen,* "[i]t is unnecessary ... to decide which vehicle [Rule 32(d) or section 2255] is correct, since it is clear that [Cannistraro] fails to meet the more liberal standard for relief...." *Id.*

---

al pending compilation of more detailed information as a basis for determining the sentence to be imposed. 28 U.S.C. § 4205(c), *repealed by* Pub.L. 98–473, Title II, § 218(a)(5), 98 Stat. 2027 (12 Oct.1984).

**16.** *The amended version of Rule 32(d), which is not applicable to this case, lists one circumstance for imposition of the "fair and just" standard: before sentence is imposed.* Fed.R. Crim.P. 32(d). *The amended statute also calls for application of the more stringent standard of section 2255 "[a]t any later time...." Id.*

Thus, the amended version of the rule support the position taken here.

**17.** The appellate court remanded the matter to determine whether the district court was subjectively satisfied there was a factual basis to accept the plea as to one count of the indictment. In a separate opinion, the district court stated it was satisfied with the factual basis for the plea and ordered that the defendant be returned for resentencing. *United States v. Allen,* 668 F.Supp. 965 (W.D.Pa.1987).

### B. *Withdrawal of the Guilty Plea*

■ The Third Circuit considers three factors in evaluating whether to permit a defendant to withdraw a plea prior to sentencing: (1) whether the defendant asserts his innocence, (2) whether withdrawal will prejudice the Government, and (3) the strength of the defendant's reasons to withdraw the plea. *Huff,* 873 F.2d at 712; *Trott,* 779 F.2d at 915; *see also Berry,* 631 F.2d at 219–20; *United States v. Crowley,* 529 F.2d 1066, 1071 (3d Cir.), *cert. denied,* 425 U.S. 995, 96 S.Ct. 2209, 48 L.Ed.2d 820 (1976). Because a defendant who has pleaded guilty has agreed to forego ordinary rights of the accused such as the presumption of innocence and trial by jury,[18] he bears the burden of establishing the existence of facts to support his motion to withdraw. *Allen,* 668 F.Supp. at 975 (citing *Berry,* 631 F.2d at 919–20). In this case, it is clear Cannistraro has not asserted his innocence and has failed to present any "fair and just" reason to withdraw his guilty plea.

#### 1. *Assertion of Innocence*

■ The first factor to which a court must look under the Third Circuit's test for Rule 32(d) motions is whether the defendant has asserted his innocence. Mere assertions of innocence unfounded on "specific evidence" do not constitute a fair and just reason to withdraw a guilty plea. *Berry,* 631 F.2d at 220; *Allen,* 668 F.Supp. at 974. An assertion of innocence must be credible to support a Rule 32(d) motion. *Berry,* 631 F.2d at 220 (citing *United States v. Washington,* 341 F.2d 277, 281 (3d Cir.), *cert. denied,* 382 U.S. 850, 86 S.Ct. 96, 15 L.Ed.2d 89 (1965)). Credible assertions of innocence are of "considerable significance." *Id.* However, "equivocatory" statements made at a Rule 11 proceeding are not sufficient to withdraw a plea if "taken as a whole [the defendant's] responses during the colloquy substantially admitted the degree of guilt to which he pleaded." *Trott,* 779 F.2d at 915.

In this case, Cannistraro has made no credible assertion of innocence. Cannistraro's affidavit, which was the original basis of this motion, never employs the words "innocent" or "not guilty" in relation to his conduct. Instead, Cannistraro's affidavit merely asserts trial counsel did not effectively research the crimes with which Cannistraro was charged:

8. Trial counsel advised me to plead guilty to several Counts of the First Indictment, despite *my belief*[19] that my actions may not have violated the law. In fact, the sentencing memorandum submitted by trial counsel stated for several counts that, although a guilty plea was entered, it was possible that no violation of law occurred.

9. Trial counsel did not thoroughly investigate the factual underpinnings necessary to result in a conviction under each count. My own subsequent research has shown that I pleaded guilty to conduct that was either not criminal under the charges contained in the instant indictment or has never been made criminal by federal statute.

Cannistraro Aff. at ¶¶ 8–9 (emphasis added). Cannistraro nevertheless argues these statements are an assertion of innocence. In support of this argument, he notes that Assistant United States Attorney John Fietkiewicz ("Fietkiewicz") stated at the Rule 32(d) hearing that the Cannistraro affidavit "made a sort of what I would say [is] an implied assertion of innocence." 2/8/90 Tr. at 259.

Cannistraro's argument is implausible. Cannistraro did not submit a credible affidavit to establish his innocence; he failed to testify at any of the evidentiary hearings regarding this motion. Negative inferences may be drawn from Cannistraro's failure to testify in support of his affidavit. *See United States v. Martinez,* 785 F.2d 111, 113 (3d Cir.1986); *United States v. Crooker,* 729 F.2d 889, 890 (1st Cir.1984); *Berry,* 631 F.2d at 220; *Washington,* 341 F.2d at 281; *Allen,* 668 F.Supp. at 975–76.

---

18. At the Rule 11 proceeding, Cannistraro acknowledged under oath he was waiving specific rights. *See* Rule 11 Tr. at 22–24.

19. This personal belief of Cannistraro was never articulated in open court or by way of affidavit.

At the first evidentiary hearing held on the Rule 32(d) motion, Cannistraro stated that he understood negative inferences could be drawn from his failure to testify in support of the allegations contained in his affidavit. He further stated that the decision not to testify was made with that concern in mind. 7/24/89 Tr. at 138. Present counsel has conceded "[t]he fact that the Government cannot cross-examine the defendant's sworn affidavit may diminish his credibility in the court's mind...." Cannistraro Viability Brief at 3. Cannistraro does not contest that the complete absence of any testimony in support of his affidavit may render it incredible. Neither the affidavit nor the evidence presented at the evidentiary hearings on the Rule 32(d) motion shows Cannistraro has made any assertion of innocence in this case.

■ The delay of one and one-half years between the entry of the plea and the filing of the Rule 32(d) motion to withdraw further suggests Cannistraro does not believe he is innocent, but merely is unhappy with the sentence originally imposed:

> A swift change of heart is itself a strong indication that the plea was entered in haste and confusion.... By contrast, if the defendant has long delayed his withdrawal motion, and has had the full benefit of competent counsel at all times, the reasons given to support withdrawal must have considerably more force.

*United States v. Barker*, 514 F.2d 208, 222 (D.C.Cir.), *cert. denied*, 421 U.S. 1013, 95 S.Ct. 2420, 44 L.Ed.2d 682 (1975). The alleged concern that Cannistraro's conduct was not criminal comes relatively recently in this proceeding, which is now nearly three years old. Cannistraro did not state he was innocent at either the Rule 11 proceeding or the detention hearing or the sentencing hearing or the Rule 35 motion or on appeal of the sentence or during the hearings on the Rule 32(d) motion to withdraw his plea. Cannistraro had ample opportunity to assert his innocence at any one of those stages, but he did not.

Significantly, Cannistraro refrains from asserting his innocence even at this stage. As noted, his affidavit never affirmatively states he did not commit the crimes with he is charged. There is a substantial difference between the statement "I am innocent" or "I am not guilty" and the equivocal statement that: "Trial counsel advised me to plead guilty to several Counts of the First Indictment, despite my belief that my actions may not have violated the law." Cannistraro Aff. at ¶ 9. Cannistraro was free to state the former, but merely advances the latter. This type of hedging cannot be taken as a credible assertion of innocence, especially in the absence of supporting testimony. Cannistraro merely contends that the plea allocution did not establish an adequate factual basis. That is not an assertion of innocence.

Fietkiewicz's comments did not concede this point. After suggesting that Cannistraro's affidavit may arguably contain an implied assertion of innocence, Fietkiewicz stated that the question of whether Cannistraro pleaded guilty to charges that were not criminal was "another issue" relating to "whether the plea allocution is sufficient."[20] 2/8/90 Tr. at 295. These statements establish that Fietkiewicz, far from interpreting the Cannistraro affidavit as an assertion of innocence, agreed with the distinction drawn above between an assertion of innocence and a legal argument that there was not an adequate factual basis for the guilty plea.

There is nothing to support present counsel's claim that "defendant never admitted,

---

**20.** The relevant discussion is reprinted below with quoted passages emphasized:

> THE COURT: .... You show me in that affidavit where he says he asserts his innocence. Does he?
>
> MR. KURZWEIL: I thought he did.
>
> MR. FIETKIEWICZ: I would say you could argue he has made *a sort of what I would say [sic] an implied assertion of innocence.*
>
> THE COURT: That's not good enough.
>
> MR. FIETKEIWICZ: That he didn't plead guilty to charges that were criminal, but that's *another issue.* That's point two of everybody's brief, *whether the plea allocution is sufficient.*
>
> THE COURT: That's entirely different than asserting innocence or lack of guilt. Now, is there anything else either of you want to say for the record?
>
> MR. KURZWEIL: Not at this point.
>
> 2/8/90 Tr. at 295 (emphasis added).

*and affirmatively denies,* that he agreed to defraud anyone in connection with the involved stock transactions and never admitted *and affirmatively denies* that he agreed with anyone to artificially raise the prices of those stocks...." Cannistraro Reply Brief at 3 (emphasis added). The only fact present counsel has been able to muster in support of an assertion of innocence is Cannistraro's sentencing memorandum. In that document, it is stated Cannistraro had "no intent to defraud the Bullock Fund or the M & I Fund." Sentencing Memorandum Submitted on Behalf of Richard Cannistraro at 6, ¶ 4. The sentencing memorandum also argues Cannistraro's conduct in counts four and five of the First Indictment may not have been criminal. *Id.* at 23, ¶ 8; *Id.* at 25, ¶ 8.

The sentencing memorandum, however, does not assert Cannistraro's innocence as to any count of the First Indictment. In fact, it states "he knows what he did was illegal and wrong." *Id.* at 2. In light of Cannistraro's failure to testify and the absence of any assertion of innocence in his affidavit, the sentencing memorandum does not contain a credible assertion of innocence. Indeed the comment is not an assertion by Cannistraro at all—much more an assertion of innocence.

Cannistraro's testimony at the Rule 11 proceeding was found to provide an adequate factual basis to support the guilty plea. Rule 11 Tr. at 56–57. He repeatedly stated his conduct had been willful and knowing. *Id.* at 14–15, 52, 53, 55, 56. This testimony admitted the crimes to which Cannistraro pleaded guilty. He may not now rely on equivocal statements made in the sentencing memorandum as an assertion of innocence. *Trott,* 779 F.2d at 915. Cannistraro has made no credible assertion of his innocence.

### 2. Prejudice to the Government

■ There is no burden on the Government to come forth with a showing of prejudice, absent the production by the de-

fendant of a fair and just reason to withdraw his guilty plea. *Berry,* 631 F.2d at 221 (citing *United States v. Saft,* 558 F.2d 1073, 1083 (2d Cir.1977)). Therefore, the absence of a showing of prejudice will have no effect on Cannistraro's Rule 32(d) motion unless it is found he has met his burden. *Martinez,* 785 F.2d at 116.

It is, however, almost three years after Cannistraro's First Indictment. The distance in time from the occurrences of the acts and conduct to which Cannistraro pleaded guilty is great. As noted, Cannistraro never asserted ineffective assistance of counsel or claimed the absence of an adequate factual basis for his plea until after his sentence of imprisonment was vacated on appeal. The clear inference to be drawn is that neither claim has factual support and both are meritless.

### 3. Reasons to Withdraw his Guilty Plea

Cannistraro has offered three alternative challenges to his guilty plea. He argues that, as to counts one through eight of the First Indictment, his guilty pleas involved conduct which was not criminal under federal law.[21] He also claims he would not have pleaded guilty but for the ineffective assistance of trial counsel in preparing for trial and in persuading him to enter a plea of guilty. Cannistraro finally argues pro se that his guilty pleas should be set aside because the Rule 11 proceeding materially deviated from the standards applicable to such hearings.

#### a. Adequate Factual Basis

■ "An otherwise valid guilty plea may be properly accepted *even if the defendant during the colloquy denies factual guilt,* so long as a factual basis is adequately provided by other sources." *Trott,* 779 F.2d at 914 n. 1 (emphasis added) (citing *North Carolina v. Alford,* 400 U.S. 25, 37–38, 91 S.Ct. 160, 167–168, 27 L.Ed.2d 162 (1970)). Where the evidence of the defendant's guilt "substantially negated his claim of innocence" and provided a ba-

---

**21.** Cannistraro does not contest the factual basis of his guilty plea as to count nine of the First Indictment. Cannistraro Initial Brief at 18.

sis for the trial judge to conclude the plea was "intelligently entered," the plea should not be questioned. *Alford,* 400 U.S. at 38, 91 S.Ct. at 167. Equivocal statements of the defendant at the Rule 11 proceeding are an insufficient basis for withdrawal if the plea allocution as a whole established an adequate factual basis for the guilty plea. *Trott,* 779 F.2d at 915.

At the Rule 11 proceeding Cannistraro did not deny his guilt or claim the conduct to which he pleaded guilty was not criminal. Moreover, he did not make these claims at any point prior to the remand of this case for resentencing. Cannistraro's post-appeal denial of factual guilt is an insufficient basis for this motion to withdraw his plea. As discussed previously, he has not asserted his innocence in this case. His present position contradicts his position at the Rule 11 proceeding where he admitted under oath his guilt and was found to have provided an adequate factual basis for his plea of guilty.

Cannistraro cannot dispute that his plea was entered voluntarily. Following the questioning at the Rule 11 proceeding, he was asked whether he still wanted to plead guilty and whether he was doing it voluntarily; he responded affirmatively. There was never the suggestion of an inadequate basis for his plea until approximately one and one-half years after his plea of guilty when the Third Circuit vacated the term of incarceration portion of his sentence and indicated the same term of incarceration could be reimposed.

Cannistraro is a highly educated individual,[22] who demonstrated at the Rule 11 proceeding his ability to understand and admit or deny each element of the crimes to which he pleaded. *Trott,* 779 F.2d at 914. On this basis, Cannistraro's assertion that he did not understand the words "knowingly" and "willfully" and would not have pleaded guilty had they been explained is unfounded and preposterous. Cannistraro Reply Brief at 3.

There is no factual basis for the attack on the prior finding at the Rule 11 proceeding. In fact, Cannistraro's testimony at the Rule 11 proceeding, including his sworn statement which is quoted in this opinion, admitted all the elements of each crime with which he was charged. Taken as a whole, Cannistraro's responses to the allocution and his statement read into the transcript provided an adequate factual basis for concluding he knowingly admitted to the guilt to which he pleaded on each count of the First Indictment.

In short, there is no need to rehash the factual basis of Cannistraro's guilty plea merely because he decided, after what amounts to a loss on appeal,[23] he did not like the sentence imposed. *Cf. Huff,* 873 F.2d at 712 (appellate court does not question findings of fact made at plea hearing merely because "defendant changed his mind about his plea."); *Trott,* 779 F.2d at 914 (trial court's finding of adequate factual basis upheld despite defendant's equivocal statements).[24]

---

**22.** His testimony at the Rule 11 proceeding revealed he holds two graduate degrees:

Q. What is the extent of your education?
A. I have a bachelor's degree in economics from M.I.T., master's degree in management from M.I.T. and a second graduate degree in accounting from Northwestern Graduate University.
Q. Is it fair to say that you have no difficulty in understanding the English language?
A. That's true.
Rule 11 Tr. at 7.

**23.** I say "after what amounts to a loss on appeal" because the Third Circuit has stated: "If the district court determines that it did not rely upon the table contained in the presentence report ..., the original sentence may, in the district court's discretion, be reinstated." *Cannistraro,* 871 F.2d at 1217. As mentioned, I

stated at the 5 May 1989 hearing that I did not rely on the table referred to by the Circuit. 5/5/89 Tr. at 3.

**24.** Merrill, who was Cannistraro's former counsel on this motion, virtually concedes that the plea allocution established an adequate factual basis and that Cannistraro's arguments are an attempt to back off from his prior admissions. The Cannistraro Initial Brief, signed by Merrill, states:

Preliminarily, Defendant notes that a review of the plea transcript, in the first instance, *appears not to readily support Defendant's position herein,* until it is read in light of the misapprehensions and misconceptions Defendant was operating under when he entered those pleas.

*Id.* at 4 (emphasis added). To the contrary, Cannistraro's admissions at the plea hearing

Upon a re-examination of Cannistraro's admissions at the Rule 11 proceeding, it is apparent an adequate factual basis existed for the acceptance of his guilty plea. Count one of the First Indictment charged Cannistraro with conspiring to commit securities fraud by artificially raising the prices of the stock in LCI and TWC in violation of section 10(b)[25] and Rule 10b–5[26] of the Securities Exchange Act of 1934 (the "1934 Act"). Cannistraro's admissions at the Rule 11 proceeding clearly established the existence of and his participation in such a conspiracy.

The statement read by Cannistraro admitted that he conspired with Vickory and Fritz to have the Funds purchase LCI and TWC. In exchange for their promises, Cannistraro would set up false nominee accounts for the benefit of Vickory and Fritz. Further questioning by the Government revealed Cannistraro aided Fritz in purchasing and selling TWC stock through a nominee account for a profit of $50,000, Rule 11 Tr. at 37–39, persuaded Vickory to have his fund purchase LCI stock, *id.* at 40, and obtained an allotment of LCI stock for Vickory's nominee. *Id.* at 41. This arrangement, which the Government aptly characterizes as a bribery scheme, worked a fraud on shareholders of the Funds in violation of Rule 10b–5. *United States v. Blitz,* 533 F.2d 1329, 1338 (2d Cir.), *cert. denied,* 429 U.S. 819, 97 S.Ct. 65, 50 L.Ed.2d 79 (1976); *Index Fund, Inc. v. Hagopian,* 609 F.Supp. 499, 506 (S.D.N.Y. 1985).

In addition, Cannistraro's testimony at the Rule 11 proceeding admitted that as a stock analyst for Wood Gundy he failed to disclose the bribery scheme with Vickory and Fritz and his own use of nominee accounts in connection with TWC. Rule 11 Tr. at 35, 50. As an allegedly disinterested stock analyst, Cannistraro had a duty to disclose his interest in TWC to Wood Gundy investors. *Chasins v. Smith, Barney & Co.,* 438 F.2d 1167, 1172 (2d Cir.1970); *Hanly v. SEC,* 415 F.2d 589, 597 (2d Cir. 1969); *Moholt v. Dean Witter Reynolds, Inc.,* 478 F.Supp. 451, 453 (D.D.C.1979). His interest in TWC or participation in the bribery schemes would be material to a potential investor who purchased the stock in reliance on Cannistraro's advice.[27] *Caravan Mobile Home Sales, Inc. v. Lehman Bros. Kuhn Loeb, Inc.,* 769 F.2d 561, 565 (9th Cir.1985); *SEC v. Rogers,* 790 F.2d 1450, 1458 (9th Cir.1986); *Zweig v. Hearst Corp.,* 594 F.2d 1261 (9th Cir.1979) *see also TSC Indust., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976) (material information is anything which would significantly alter reasonable investor's actions). Failure to disclose these facts constituted a violations of section 10(b) and Rule 10b–5.

Cannistraro's involvement with setting up false nominee accounts was the subject of counts two through five of the First Indictment. Specifically, counts two through five involved the use of the names of Mary Godano, Edward Cannistraro, Donna Lee Clarambeau and Key, respectively, to set up nominee accounts at Monarch.

In his statement at the Rule 11 proceeding, Cannistraro unequivocally admitted setting up these accounts. In addition, he admitted that while holding a partial bene-

constitute an adequate factual basis now as they did at the time the guilty plea was entered.

**25.** Section 10(b) prohibits the use of any instrumentality of commerce or facility of any national securities exchange in connection with a securities transaction that employs "any manipulative or deceptive device or contrivance." 15 U.S.C. § 78j(b).

**26.** Rule 10b–5 makes it unlawful to use an instrumentality of commerce or facility of a national securities exchange in connection with the utilization of any device, scheme or artifice to defraud, the assertion of any untrue statement or omission of material fact and the par-

ticipation in any act which would operate as a fraud or deceit upon any person in connection with the sale of a security. 17 C.F.R. 240.10b–5(a)–(c).

**27.** Cannistraro's reliance on *Chiarella v. United States,* 445 U.S. 222, 100 S.Ct. 1108, 63 L.Ed.2d 348 (1980), and *Barnett v. Kirshner,* 527 F.2d 781 (2d Cir.1975), is misplaced. Those cases involved situations in which the defendant did not have a duty to disclose material information. However, Cannistraro had such a duty and violated it by failing to disclose his interest in TWC and his participation in the bribery scheme.

ficial interest in the Mary Godano and Edward Cannistraro accounts, he effected the trading of LCI stock through those accounts, resulting in a profit of approximately $45,000. Rule 11 Tr. at 41–44. During the allocution by Warren, Cannistraro admitted he had provided Donna Lee Clarambeau with money to set up an account at Monarch and that Cannistraro had profited from trading TWC securities through this account. He also admitted to similar conduct involving the Key account. *Id.* at 44–48. Cannistraro failed to disclose his interests in or control of these accounts to the public in violation of section 10(b) and Rule 10b–5 of the 1934 Act. *SEC v. Manor Nursing Ctrs., Inc.,* 458 F.2d 1082, 1095–96 (2d Cir.1972); *SEC v. Scott,* 565 F.Supp. 1513, 1526 (S.D.N.Y.1983), *aff'd,* 734 F.2d 118 (2d Cir.1984).

In count six of the First Indictment, Cannistraro was charged with violations of section 10(b) and Rule 10b–5 through the creation of false and misleading TWC research reports through Wood Gundy. Cannistraro admitted he failed to disclose in his reports the use of nominee accounts to conceal his interest in TWC and his bribery scheme with Vickory and Fritz. Rule 11 Tr. at 27–28, 48–50.

Cannistraro's testimony at the Rule 11 proceeding also established his guilt on counts seven and eight of the First Indictment. He admitted that he knew the transfer of any amount of money through interstate commerce by any of his co-conspirators would result in his conviction of interstate transportation of money obtained by fraud in violation of 18 U.S.C. § 2314. Rule 11 Tr. at 28. Cannistraro stated he intended for the bribery scheme to benefit Vickory and intended that fraudulently obtained TWC proceeds would be transferred by Vickory to New Jersey. *Id.* at 52. Cannistraro's participation in this scheme was sufficient to establish his guilt under a *Pinkerton* theory. *See supra* note 5.

Finally as to the mail fraud charge in count eight of the First Indictment, Cannistraro admitted he knew that the Continental Transfer Company ("Continental") was the transfer agent for LCI and TWC and that there would be mail communications between Continental and the Marshall & Ilsley Bank ("M & I Bank"). *Id.* at 53. The bribery scheme and the transfer of TWC and LCI securities to the M & I Bank could not have occurred without these communications, as Cannistraro admitted. *Id.* These communications were in furtherance of the conspiracy to defraud and therefore were in violation of 18 U.S.C. § 1341. *United States v. Goldberg,* 401 F.2d 644, 647 (2d Cir.1968), *cert. denied,* 393 U.S. 1099, 89 S.Ct. 895, 21 L.Ed.2d 790 (1969); *United States v. Bloom,* 78 F.R.D. 591, 605–606 (E.D.Pa.1977); *cf. United States v. Brown,* 583 F.2d 659, 664 (3d Cir.1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1217, 59 L.Ed.2d 456 (1979) (mail to victim to give appearance of legitimacy of business transaction is in furtherance of conspiracy).

For the foregoing reasons, Cannistraro's testimony at the Rule 11 proceeding established an adequate factual basis to accept his plea of guilty to counts one through eight of the First Indictment. His belated and baseless attempts to deny his sworn testimony at the time of his guilty plea underscores the incredibility of any assertion of innocence Cannistraro claims to have made. Therefore, he has not met his burden of establishing that denial of this motion would unfairly or unjustly force him to suffer the consequences of his conduct.

### b. *Assistance of Counsel*

The record is devoid of credible evidence in support of Cannistraro's claim that he was denied effective assistance of counsel at the Rule 11 proceeding. The basis for this motion when it was filed was the affidavit of Cannistraro, which accused trial counsel of serious errors, misrepresentations and omissions while advising Cannistraro to plead guilty to all nine counts of the First Indictment.

Cannistraro was given an opportunity to substantiate these accusations at the Rule 32(d) hearings held on 24 July 1989, 1 February 1990 and 8 February 1990.[28] How-

---

**28.** Present counsel indicated he requested the

hearing only with regard to the ineffective as-

ever, he did not testify at those hearings. He expressly acknowledged that his failure to testify could lead to negative inferences regarding the credibility and weight of his affidavit and that his testimony might be indispensable in establishing the validity of his claims. 7/24/89 Tr. at 138. The evidentiary support for Cannistraro's ineffective assistance of counsel claim is limited to his affidavit, the affidavits of O'Connor and Gersten calling Cannistraro's allegations "totally false" [29] and the evidence and testimony elicited from the witnesses at the Rule 32(d) hearings.

█ When a defendant who has pleaded guilty challenges the validity of the plea on a claim of ineffective assistance of counsel, the burden rests with him to prove both elements of the test approved in *Hill v. Lockhart*, 474 U.S. 52, 106 S.Ct. 366, 88 L.Ed.2d 203 (1985). First, he must show the challenged acts or omissions of counsel demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 57, 106 S.Ct. at 369 (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984)). Second, he must show counsel's ineffective representation "prejudiced" him; in other words, he must show a "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* 474 U.S. at 59, 106 S.Ct. at 370. *See Diggs v. Owens*, 833 F.2d 439, 444–445 (3d Cir.1987), *cert. denied*, 485 U.S. 979, 108 S.Ct. 1277, 99 L.Ed.2d 488 (1988); *Dooley v. Petsock*, 816 F.2d 885, 889 (3d Cir.), *cert. denied*, 484 U.S. 863, 108 S.Ct. 182, 98 L.Ed.2d 135 (1987); *United States v. Giardino*, 797 F.2d 30, 31 (1st Cir.1986).

A court must be "highly deferential" to counsel's decisions in scrutinizing counsel's performance against the objective standard of reasonableness. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. There is a "strong

presumption" that counsel's performance was reasonable. *Id.* The court must minimize the effects of hindsight and must evaluate the conduct of counsel from the standpoint of the facts at the time. *Id.* As noted in *United States v. Gray*, 878 F.2d 702 (3d Cir.1989): "It is ... only the rare claim of ineffectiveness of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." *Id.* at 710.

Before examining the record to determine whether he has adduced evidence to meet his burden under the *Hill* test, it must be noted that Cannistraro's failure to testify in support of the allegations contained in his affidavit renders it incredible. Indeed, Cannistraro's counsel admits "[t]he fact that the Government cannot cross examine the defendant's sworn affidavit may diminish his credibility in the court's mind...." Cannistraro Viability Brief at 3.

Cannistraro's allegations of ineffective assistance of counsel may be addressed under two broad rubrics: the trial strategy of O'Connor and Gersten up to the time Cannistraro pleaded guilty and the advice of trial counsel with regard to the decision to plead guilty itself. In considering each of these areas, the two-part *Hill* test must be observed. The ultimate issue is whether trial counsel's conduct fell below an objective standard of reasonableness and, if so, whether Cannistraro would not have entered his guilty plea but for the ineffective assistance of trial counsel.

### i. *Trial Strategy*

█ The evidence which is most relevant and which carries the most weight in this determination is, of course the testimony of Gersten and O'Connor which was presented at the evidentiary hearings at the Rule 32(d) motion. Briefly stated, that testimony revealed trial counsel had a well-conceived trial strategy for the defense of

---

sistance of counsel claims. Present counsel further represented he did not want a hearing with regard to the adequate factual basis portion of the Rule 32(d) motion. Rule 32(d) Tr., at 143.

**29.** The O'Connor and Gersten affidavits were appended as Exhibits B and C to the Govern-

ment's Memorandum in Support of Motion to Disqualify Bruce M. Merrill, Esq., dated 12 May 1989. Apparently, the O'Connor and Gersten Affidavits were not filed in the Office of the Clerk of the Court.

this case. O'Connor's testimony indicated his trial strategy was to divert the jury's attention from the allegations in the First Indictment over to the issue of whether TWC was a viable company. O'Connor planned to argue that the First Indictment mistakenly charged that TWC was not viable and in fact that the company would not have failed but for the lack of available Government funds to clean up toxic waste. 7/24/89 Tr. at 29, 80–81; 2/8/90 Tr. at 176–79.

The trial strategy of O'Connor required that trial counsel locate witnesses who had a role in TWC. 2/8/90 Tr. at 249. However, trial counsel did not want to present the testimony of witnesses who also had a role in LCI because O'Connor feared that company was never actually viable. *Id.* at 181–82. After discussing the matter with Cannistraro, trial counsel concluded this strategy would be harmed by calling Blake and Waldron, who had both worked for LCI and TWC. *Id.* at 181–82, 249. Instead, trial counsel intended to focus on the testimony of Peter Blake III, Congressman Robert Roe and Cannistraro himself.

Cannistraro nevertheless contends trial counsel did not adequately prepare for trial because they did not hire expert witnesses, did not interview potential Government witnesses and did not review all the documentary evidence. Cannistraro argues the failure to hire an accountant particularly disadvantaged him because the Government's case relied on the records of Monarch, the brokerage firm where Cannistraro opened the nominee accounts to conceal his, Vickory's and Fritz's interests in LCI and TWC. Cannistraro Proposed Findings at 11–12. Cannistraro argues trial counsel misunderstood the relevance of the documentary evidence to the case. *Id.* at 13.

To the contrary, the testimony at the Rule 32(d) hearings demonstrated Gersten and O'Connor did review documentary evidence prior to trial. As they reviewed the Government's proposed trial exhibits, moreover, they recognized that Cannistraro

played an important role in the LCI and TWC conspiracies. Based on their discussions with Cannistraro, trial counsel learned the Government's case was much stronger than originally anticipated.

For example, when O'Connor saw the wire that Wood Gundy sent indicating it would issue a research report on TWC, he realized it contained much of the information that was in the final research report. This substantially undermined the defense that the nominees of Cannistraro had sold their interests in TWC prior to issuance of Cannistraro's report favorably reviewing TWC. O'Connor knew the Wood Gundy wire could be used by the Government to establish the price of TWC rose as a result of the wire itself and that the subsequent report written by Cannistraro was not the only factor involved in the manipulation of TWC stock prices. In addition, O'Connor did not pursue the fact that the First Indictment contained an incorrect date for the issuance of Cannistraro's report because certain of the nominees holding TWC securities sold them following the issuance of the wire. 7/24/89 Tr. at 65; 2/8/90 Tr. at 229–30.

Gersten testified that after reviewing the trading records of Vickory and Fritz it became apparent that the Funds did not usually purchase speculative stocks such as LCI. The records indicated some of the stock sold from Cannistraro nominee accounts ended up in the Funds. 7/24/89 Tr. at 129–130. Gersten and O'Connor testified that Cannistraro became upset when he learned some of the transfers from the nominees were clearly linked to Fund transactions. *Id.* at 90, 129–30.

In addition, Gersten and O'Connor found it difficult to find witnesses to testify on Cannistraro's behalf. Leo Eisenberg, the president of Monarch, and Richard Bertoli, co-defendants with Cannistraro in a securities case by the Securities Exchange Commission ("SEC") involving TWC and LCI, were unavailable. Peter Blake III,[30] a witness who knew of TWC but not LCI, was

---

**30.** Peter Blake III is apparently the son of Blake, who was president of TWC and who

testified at the Rule 32(d) hearings.

also unavailable. *Id.* at 30; 2/8/90 Tr. at 191–92. Cannistraro directed O'Connor to rely on an investigator who had been hired by Bertoli in the SEC action to find witnesses, but Vickory and Key could not be located. 7/24/89 Tr. at 36–37; 2/8/90 Tr. at 230–31. Fritz was located but refused to be interviewed. 7/24/89 Tr. at 32–33, 130; 2/8/90 Tr. at 230. Based on years of experience as a prosecutor and defense attorney as well as suggestions from the United States Attorney's office, O'Connor believed Fritz had made a deal with the United States and would not speak to defense counsel. 7/24/89 Tr. at 33–34.

O'Connor also determined Blake and Waldron should not be called as character witnesses for the defense because they had knowledge about the facts of the case and could be effectively cross-examined by the Government regarding their involvement in the case. 2/8/90 Tr. at 221, 297–98. Blake, who was president of TWC during its initial public offering, testified at the 1 February 1990 hearing. He testified that he believed TWC was a viable company and that, in his opinion, Cannistraro's report of TWC was accurate.[31] 2/1/90 Tr. at 124–131. However, O'Connor testified he had discussed the strategy of not calling Blake as a character witness with Cannistraro and he agreed that this was proper. 2/8/90 Tr. at 249.

Waldron asserted his fifth amendment privilege at the 1 February 1990 hearing. His proffer, which was offered by present counsel and made part of the record, indicated he would be a character witness, but was not contacted by trial counsel. 2/1/90 Tr. at 87. However, this was part of the decision by O'Connor not to call character witnesses who had knowledge about the facts of the First Indictment. O'Connor stated that in his judgment a character witness who takes the fifth is not a strong witness. 2/8/90 Tr. at 224. In addition, O'Connor knew Cannistraro's relatives would be testifying against him. *Id.* at

223–24. In sum, O'Connor testified there were no character witnesses who would testify on behalf of Cannistraro. 7/24/89 Tr. at 82.

The only material witness who testified at the hearings was Wolff, who testified at the 1 February 1990 hearing on behalf of Cannistraro. Wolff stated he would have been available to provide trial counsel with information regarding TWC and LCI. Wolff was the attorney who wrote and filed the registration statements of the companies and represented TWC in negotiations with Thatcher Engineering, Inc. ("Thatcher"), an Indiana company which had devised a unique method of containing toxic waste but lacked government funding.

To establish the viability of TWC, O'Connor's trial strategy was to bring out that TWC and Thatcher signed a contract under which TWC was to find government funding for Thatcher. 2/8/90 Tr. at 263–64. O'Connor testified he spoke to William Barton ("Barton"), the attorney for TWC after the company went public and Barton indicated the existence of the contract was in dispute. *Id.* at 186–87. O'Connor stated this seriously undermined the defense strategy of making TWC appear to be a viable company because the contract with Thatcher was the one fact O'Connor needed to press the argument that TWC was more than merely a shell. *Id.* At the 1 February 1990 hearing, Wolff testified he thought the contract between Thatcher and TWC was valid. 2/1/90 Tr. at 114–115. Cannistraro claims O'Connor failed to contact Wolff and thereby gave up the defense without adequately investigating it.

O'Connor did not merely give up the defense, as Cannistraro claims. Barton made clear to O'Connor that the dispute over the Thatcher contract involved the claim by a third company, J.E. Brenneman Company ("Brenneman"), which had a joint venture with Thatcher and another compa-

---

31. Based upon my observations of Blake's demeanor and testimony while on the stand, I find him to be an incredible witness. He admitted conduct involving stock transactions which suggest he would be a poor, if not damaging, character witness at trial. To the extent his testimony was relevant at all to the ineffective assistance of counsel issue in this case, it was incredible and of no weight.

ny. Barton told O'Connor that lawyers for Brenneman and Thatcher did not accept the exclusive arrangement between TWC and Thatcher. 2/8/90 Tr. at 1987–89.

O'Connor reviewed two letters from Thatcher's attorney to Wolff which appeared to indicate the contract with TWC would not be effective until the Brenneman agreement was canceled. *Id.* at 255–56. O'Connor also interviewed an officer of Thatcher who confirmed the existence of the dispute over the TWC contract. *Id.* at 189. Gersten suggested to Cannistraro that trial counsel attempt to contact Wolff, but Cannistraro rejected that suggestion. *Id.* at 221–22. Based on this investigation, O'Connor determined that the viability of TWC was not a feasible defense.[32] Following the meeting with Barton, O'Connor told Cannistraro he had virtually no defense to the First Indictment. *Id.* at 189–90.

The testimony of the witnesses at the Rule 32(d) hearings demonstrates trial counsel attempted to develop a prudent trial strategy and investigated it to the extent possible. Ultimately, trial counsel determined Cannistraro could not realistically expect to rely on the viability of TWC as a defense and advised him of this fact. The contention presented by Cannistraro in support of his claim that trial counsel should have pushed the investigation further is implausible. In fact, the testimony of O'Connor and Gersten establishes Cannistraro advised against further investigation and rejected the suggestion that they contact Wolff. Even if Wolff and Blake had been interviewed by trial counsel, however, I find their testimony to be unsupportive of the viability of TWC. To the extent that these witnesses made any statements to support Cannistraro's claims, I find their testimony to be incredible. In point of

fact, their demeanor while on the witness stand in this matter leads to the conclusion that they would have seriously damaged Cannistraro at trial. These witnesses are simply not credible and not believable.

Cannistraro also argues the pretrial motion practice of trial counsel was ineffective because they did not file a motion for a bill of particulars and did not move to change venue on count nine of the First Indictment. Cannistraro argues that trial counsel's failure to make a motion for a bill of particulars severely hampered the ability of Cannistraro to prepare his defense. However, O'Connor testified he never moved for a bill of particulars because the names of the most relevant unindicted co-conspirators, Vickory and Fritz, were contained in the First Indictment. 7/24/89 Tr. at 30–31.

In addition, Cannistraro has not demonstrated trial counsel was unaware of the existence of material witnesses or evidence which may have aided Cannistraro in his defense. Indeed, as noted above, trial counsel attempted to contact many witnesses and decided not to contact others after considering the trial strategy. Even assuming this court would have granted a motion for a bill of particulars,[33] there is no evidence that the failure of trial counsel to make such a motion impacted Cannistraro's decision to plead guilty. Cannistraro was and is familiar with all of the people involved in his transactions and was capable of appraising trial counsel of their names. No new names have surfaced nor is there a suggestion such other people are available but were not discovered by trial counsel. Accordingly, the argument is irrelevant to the *Hill* test of ineffective assistance of counsel.

---

**32.** A central issue to the defense was whether Wolff sent a signed or unsigned contract to Thatcher in January 1983. O'Connor testified that after reviewing documents provided by Barton, he concluded Wolff did not send a signed contract to Thatcher until February under a cover letter which indicated the contract was not effective until the arrangement with Brenneman was canceled. 2/8/90 Tr. at 255–56. Based on the exhibits submitted by the Government and my observation of the witnesses who testified, to the extent Wolff's testimony

contradicts O'Connor's testimony, I find it to be incredible. Succinctly stated, Wolff is not a believable witness. There is virtually no possibility Wolff could have been of assistance to Cannistraro in defending against the First Indictment.

**33.** This argument is far from certain. *See United States v. Zolp,* 659 F.Supp. 692, 706–07 (D.N.J.1987).

■ As to the argument that trial counsel's conduct fell below an objective standard of reasonableness because they did not move to dismiss count nine of the First Indictment for lack of proper venue, the testimony of O'Connor established he considered the venue issue through discussions with Bertoli, as directed by Cannistraro, but determined venue in New Jersey was proper. 7/24/89 Tr. at 102–3. Cannistraro argues that at the time of the First Indictment only one case in this Circuit addressed the issue of proper venue and that case held that ille͵al acts to influence a Grand Jury committed outside a district were not sufficient to establish venue in the district where the Grand Jury was sitting. *United States v. Bachert,* 449 F.Supp. 508 (E.D.Pa.1978).

It appears there is a split in authority concerning this issue. *See United States v. Reed,* 773 F.2d 477 (2d Cir.1985) (discussing cases and rejecting *Bachert*). Although the Third Circuit has not considered the issue, the majority of circuits hold that venue is proper in the district where the proceeding sought to be obstructed was pending. *Id.* at 484–85. While an argument could have been made to the contrary, O'Connor did not erroneously determine that venue was proper in this district. Cannistraro cannot demonstrate the venue motion would have produced favorable results.[34]

In fact, O'Connor testified he did not bring a motion to change venue because the First Indictment included allegations that established connections of the other offenses with New Jersey. 7/24/89 Tr. at 104. Giving deference to trial counsel's judgment at the time the instant offense was pending and minimizing the benefit of hindsight, it is not plausible to conclude that trial counsel's conduct fell below an objective standard of reasonableness merely because they did not recognize that one

district court opinion supported a minority view that venue may not have been proper.[35] Trial counsel's conduct was not unreasonable.

■ Trial counsel also acted according to responsible professional standards by withdrawing its request for witness lists and by advising Cannistraro to plead guilty to the First Indictment prior to receiving exculpatory and impeachment evidence from the Government. O'Connor testified that the decision to withdraw the witness list motion was a tactical decision because the court had indicated it was not inclined to grant the motion and O'Connor withdrew the motion in an effort to strengthen his motions for disclosure of 404(b) evidence. 7/24/90 Tr. at 46–47. In addition, he testified that the decision to plead his client prior to reviewing impeachment material was an effort to convince the court at sentencing that Cannistraro was entitled to some leniency for accepting responsibility without being "forced into a corner" to do so. *Id.* at 109. Cannistraro has not demonstrated that these decisions were unreasonable or that his decision to plead would have been different had trial counsel not taken this approach.

ii. *Decision to Enter the Guilty Plea*

Cannistraro also claims that trial counsel's advice to plead guilty to all counts of the First Indictment was erroneous and that he would not have entered the guilty plea but for this erroneous advice. At the outset, it must be noted that a number of serious charges by Cannistraro which are contained in the Cannistraro affidavit are not credited in this discussion. Specifically, I find there is no evidence to support the following claims which are contained in the Cannistraro affidavit: trial counsel did not tell Cannistraro that his probable sentence would be at most a short stay at a

**34.** By not bringing the motion to dismiss for improper venue, Cannistraro waived objection to venue in this district. *United States v. Turcotte,* 515 F.2d 145 (2d Cir.), *cert. denied,* 423 U.S. 1032, 96 S.Ct. 564, 46 L.Ed.2d 406 (1975).

**35.** In addition, it is noted Cannistraro has not challenged the adequacy of the factual basis for

count nine. Thus, even if counsel's conduct was unreasonable, Cannistraro waived objection to venue in New Jersey and pleaded guilty to the conduct here. Cannistraro cannot now argue his guilty plea should be withdrawn on this count of the First Indictment.

**1132**

camp where he would play tennis and make new friends, trial counsel did not tell Cannistraro that he would receive a shorter sentence than R. Foster Winans and trial counsel did not consume alcoholic beverages and fall asleep at the meeting at which the decision to plead guilty was made. In fact, the testimony of O'Connor established he told Cannistraro that he would probably serve his sentence in a prison camp in California and that O'Connor would argue for a shorter sentence than that given to Winans. 2/8/90 Tr. at 233–35. O'Connor predicted Cannistraro would receive eight years. *Id.* at 232. I find Cannistraro's claims to the contrary to be baseless and incredible.[36]

■ Turning to the other allegations, it also appears that trial counsel's conduct did not violate objective standards of reasonableness. The testimony at the Rule 32(d) hearings established that trial counsel prudently and responsibly considered the benefit of entering a guilty plea and attempted to minimize the sentence Cannistraro ultimately would receive. O'Connor and Gersten at all times behaved in a manner consistent with the best interests of their client.

Prior to Cannistraro's decision to plead guilty, Gersten contacted Warren, the prosecutor, to determine his position on a plea agreement. Warren informed Gersten that if Cannistraro did not cooperate with the Government, he must go to trial or plead to the entire First Indictment. Gersten related this information to Cannistraro and strongly urged him to cooperate. 7/24/89 Tr. at 75, 133. O'Connor believed Cannistraro should have cooperated with the Government and pleaded guilty. *Id.* at 80. O'Connor also believed the Government would not enter into a plea agreement without the cooperation of Cannistraro and would object to the entry of a *nolo contendere* plea. *Id.* at 75–77. Accordingly,

O'Connor did not inquire of Warren as to the possibility that the Government would agree to take no position at sentencing and did not believe this court would accept a *nolo contendere* plea over the objections of the Government. *Id.* at 76–77, 112, 283.

O'Connor suggested to Cannistraro that he plead guilty to the entire First Indictment based upon a carefully worded plea allocution which minimized the involvement of Cannistraro in the manipulation of TWC and LCI stock. O'Connor believed he could minimize the impact of Cannistraro's past fraudulent activities at sentencing. 2/8/90 Tr. at 197, 231. However, trial counsel indicated Cannistraro would probably receive a sentence of incarceration based on research of prior securities sentences of this court and discussions with former United States Attorneys. 7/24/90 Tr. at 78. O'Connor also predicted the court would require Cannistraro to make full restitution. *Id.* at 112.

In point of fact, shortly before sentencing, O'Connor predicted Cannistraro would receive eight years imprisonment. *Id.* at 79, 134; 2/8/90 Tr. at 232. Gersten and O'Connor told Cannistraro that a sentence of eight years would make him eligible for parole in three and one-half years and that parole would depend on the amount of money the court found to be involved in the fraud. 7/24/89 Tr. at 134. O'Connor advised Cannistraro that if he plead guilty, his admissions could be used against him by the SEC and in subsequent civil, criminal or tax matters. *Id.* at 110–12. O'Connor also told Cannistraro that if he did not plead guilty and was convicted after trial, he would face a much longer sentence. 2/8/90 Tr. at 280.

O'Connor took a full week to draft the statement that Cannistraro read at the Rule 11 proceeding. O'Connor believed this statement was effective in minimizing Cannistraro's role in the manipulation of

---

**36.** In addition, I find that trial counsel did not advise Cannistraro to plead merely because his retainer had run out. Cannistraro knew his retainer was only an advance against hourly rates and that a portion of the retainer was to pay for work already completed on the SEC matter. Trial counsel notified Cannistraro that

his retainer had been exhausted prior to the commencement of the trial date. Trial counsel never demanded a specific amount of money from Cannistraro in order to continue working on the case. I also find that there were no conflicts of interest between in trial counsel's representation of Cannistraro.

TWC and LCI stock. *Id.* at 208. Cannistraro knew that he should come to the plea hearing with his bags packed, as he could expect Warren to press for immediate incarceration. *Id.* Without a detention hearing, information regarding Cannistraro's past wrongful behavior could be kept from the court, possibly improving Cannistraro's position at the time of sentencing. O'Connor told Cannistraro not to oppose the demand for immediate incarceration, but Cannistraro requested that O'Connor oppose the detention. *Id.*

The foregoing discussion demonstrates that trial counsel's representation of Cannistraro met an objective standard of reasonable conduct and that trial counsel did not make erroneous or misleading representations to Cannistraro which lead him to plead guilty against his best interests or desires.

The Cannistraro affidavit contributes nothing but baseless allegations in support of the motion to withdraw his guilty plea. Accordingly, the Rule 32(d) motion is denied on the grounds of ineffective assistance of counsel.

### 4. *Deviations from Rule 11*

Rule 11 of the Federal Rules of Criminal Procedure establishes the procedures for acceptance of a defendant's guilty plea. The rule requires a trial judge to address the defendant personally, in open court to determine whether the defendant understands, among other things, "the nature of the charge to which the plea is offered...." Fed.R.Crim.P. 11(c)(1). The court must make inquiry into whether the plea is voluntary and whether it is the result of discussions between the defendant or his attorney and the attorney for the Government. *Id.* 11(d).[37]

The Third Circuit requires strict compliance with the standards of Rule 11. *United States v. Keller,* 594 F.2d 939, 943 (3d Cir.1979) (citing *Horsley v. United States,* 583 F.2d 670 (3d Cir.1978)). The Supreme Court has held that noncompliance with the Rule 11 safeguards requires that the defendant's guilty plea be set aside and a new hearing be held at which the defendant may plead anew. *McCarthy v. United States,* 394 U.S. 459, 472, 89 S.Ct. 1166, 1174, 22 L.Ed.2d 418 (1969). This policy ensures that the defendant receives the benefits of the procedural safeguards contained in Rule 11 and "reduce[s] the great waste of judicial resources required to process the frivolous attacks on guilty plea convictions that are encouraged, and are more difficult to dispose of, when the original record is inadequate." *Id.* However, this requirement is not to be interpreted to "impose an undue rigidity on the Rule 11 hearing and completely distort its purpose." *Keller,* 594 F.2d at 943. *Accord McCarthy,* 394 U.S. at 459, 89 S.Ct. at 1167 ("matters of reality and not mere ritual should be controlling").

Rule 11 was amended in 1983 to provide: "Any variance from the procedures required by this rule which does not affect substantial rights shall be disregarded." Fed.R.Crim.P. 11(h). *See United States v. Fulford,* 825 F.2d 3, 7 (3d Cir.1987). The Advisory Committee explained that this amendment was intended to restrict the holding of the Supreme Court's decision in *McCarthy* from being read to mean the harmless error provision of Rule 52(a)[38] does not apply to Rule 11 proceedings. *See* Notes of the Advisory Committed on Rules, 1983 Amendment to Rule 11. The Advisory Committee stated: "Subdivision (h) makes *no change* in the responsibilities of the judge at Rule 11 proceedings, but in-

---

37. Besides the requirement that a defendant be informed of the nature of the charge, Rule 11 contains other requirements; for example, the court must inform the defendant that he is waiving his rights to a jury trial, to confront witnesses and to the assistance of counsel. Fed. R.Crim.P. 11(c)(3). It is unnecessary to discuss the full requirements of Rule 11 because Cannistraro only challenges the requirements noted above.

38. Rule 52(a) provides for the application of the harmless error standard to the provisions of the Federal Rules of Criminal Procedure as a whole; it states: "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." Fed.R.Crim.P. 52(a).

stead merely rejects the extreme sanction of automatic reversal." *Id.* (emphasis in original).

Although Rule 11 unequivocally directs the court to address the defendant personally regarding the nature of the crime prior to acceptance of a plea of guilty, no particular procedure must be followed. *Trott,* 779 F.2d at 914. The trial court may make inquiry of the defendant, defense counsel or the Government regarding the factual basis for the plea. *Id.* (citing Notes of the Advisory Committed on Rules, 1966 Amendment to Rule 11).

Nevertheless, as stated by the Advisory Committee:

> [S]ubdivision (h) should *not* be read as supporting extreme or speculative harmless error claims or as, in effect, nullifying important Rule 11 safeguards. There would *not* be harmless error under subdivision (h) where, for example, as in *McCarthy,* there had been absolutely no inquiry by the judge into defendant's understanding of the nature of the charge and the harmless error claim of the government rests upon nothing more than the assertion that it may be "assumed" defendant possessed such understanding merely because he expressed a desire to plead guilty.

Notes of the Advisory Committed on Rules, 1983 Amendment to Rule 11 (emphasis in original). The Advisory Committee continued:

> Likewise, it would *not* be harmless error if the trial judge totally abdicated to the prosecutor the responsibility for giving to the defendant the various Rule 11 warnings, as this "results in the creation of an atmosphere of subtle coercion that clearly contravenes the policy behind Rule 11."

*Id.* (quoting *United States v. Crook,* 526 F.2d 708 (5th Cir.1976)).

Relying on *McCarthy* and cases decided prior to the 1983 amendment of Rule 11, Cannistraro argues in his pro se brief that the Rule 11 proceeding materially deviated from the procedures established by Rule 11 and he should be permitted to plead anew. Cannistraro makes three specific allega-

tions in support of his argument: the prosecutor was permitted to ask questions concerning the factual basis for the plea, the First Indictment was not read to Cannistraro at the Rule 11 proceeding and Cannistraro did not receive an adequate explanation of the substantive elements of the crimes with which he was charged.

*Horsley v. United States, supra,* (*"Horsley I"*) demonstrates that Cannistraro's arguments draw on an unreasonably narrow reading of the requirements of Rule 11. In *Horsley I,* the trial judge asked the defendant at the plea allocution hearing whether he had received a copy of the indictment and reviewed it with his attorney. The defendant stated he had read the indictment and understood the charge against him, which was conspiracy to distribute heroin. *Horsley I,* 583 F.2d at 671.

On a collateral attack to the sentence under 28 U.S.C. § 2255, the Third Circuit held the trial judge had not satisfied the strict requirements of Rule 11. The Third Circuit stated:

> In view of the clear prescription ... that the court *personally* inform the defendant of the nature of the charges and the acts which would render him guilty, we must hold that the district court's reliance on the [defendant's] private reading of the indictment and discussions of it with his attorney constitutes error. .... [P]rior decisions of this court preclude us from permitting the district court to abdicate to the [defendant] and his attorney responsibility for minimal compliance with Rule 11.

*Id.* at 672. The *Horsley I* court noted that simply reading the indictment to the defendant would have satisfied this requirement. *Id.* The trial judge did not read the indictment or explain the elements of the charge to the defendant. The *Horsley I* court therefore remanded the case to permit the plea to be withdrawn and the defendant plead anew.

Soon after the *Horsley I* decision, the Supreme Court decided the case of *United States v. Timmreck,* 441 U.S. 780, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979), which denied collateral relief where the district court

failed to inform the petitioner of a mandatory special parole term prior to acceptance of a guilty plea. The *Timmreck* Court held that such relief required a showing of prejudice to the defendant and stated "collateral relief is not available when all that is shown is a failure to comply with the formal requirements of Rule 11." *Id.* at 784, 99 S.Ct. at 2087. The Court held a fundamental defect or omission did not occur because the petitioner did not "argue that he was actually unaware of the special parole term or that, if he had been properly advised by the trial judge, he would not have pleaded guilty." *Id.*

Subsequent to the *Timmreck* decision (but prior to the amendment of Rule 11), the Third Circuit again had occasion to visit the requirements for a challenge to a district court's compliance with Rule 11 in the context of section 2255. Ironically, the petitioner was the same individual who had been granted collateral relief in *Horsley I. See United States v. Horsley,* 599 F.2d 1265, 1269 n. 5 (3d Cir.), *cert. denied,* 444 U.S. 865, 100 S.Ct. 135, 62 L.Ed.2d 88 (1979) ("*Horsley II*"). In *Horsley II,* the petitioner sought to have his guilty plea set aside on a separate indictment for a related offense.

Relying on the holding of *Timmreck,* the Third Circuit held Horsley was not entitled to section 2255 relief because he "failed to maintain that he did not understand the nature of the charge to which he pled, or that he would have pled not guilty but for the district court's error...." *Id.* at 1269. The *Horsley II* court rejected the reasoning of *Horsley I* to the extent it held "a defendant automatically suffers prejudice whenever the district court fails to comply with the 'nature of the charge' requirement of Rule 11." *Id.*

Under Rule 11(h), a similar showing of prejudice must be made to entitle a defendant to relief on direct appeal of his sentence, *United States v. De Le Puente,* 755 F.2d 313, 314–15 (3d Cir.), *cert. denied,* 474 U.S. 1005, 106 S.Ct. 524, 88 L.Ed.2d 456 (1985), and as in this case, on an appeal from an order denying the defendant's motion to withdraw his plea of guilty. *See United States v. Henry,* 893 F.2d 46, 48 (3d Cir.1990). Therefore, even if the Rule 11 proceeding did not comply with the formal requirements of Rule 11, Cannistraro is not entitled to withdraw his plea of guilty absent a showing that these alleged defects somehow affected his substantial rights. *Id.*

There has been absolutely no showing that Cannistraro would not have decided to plead guilty if the court, rather than the United States attorney, had posed the questions to establish the factual foundation for the guilty plea or if the First Indictment had been read at the Rule 11 proceeding. Cannistraro's attempt to argue a contrary position is unpersuasive.

At the Rule 11 proceeding in this case, Cannistraro was extensively questioned by the court as to the voluntariness of the plea and his understanding of the charges against him. Rule 11 Tr. at 7–9, 21–24. The First Indictment was not read to Cannistraro at the Rule 11 proceeding; however, he admitted having read the First Indictment and having discussed it with his attorney. *Id.* at 8–9.[39] Indeed, it was the basis and the framework for the voluntary statement of Cannistraro which he constructed with trial counsel and read at the Rule 11 proceeding.

Additionally, Cannistraro was asked whether he had received a copy of the 18

---

**39.** This discussion is recorded as follows:

Q Now, have you reviewed the indictment, have you read it?
A Yes, your Honor.
Q Have you discussed the indictment with your attorney?
A Yes, your Honor.
Q Are you satisfied with the representation of your attorney?
A Yes.

Q Has he explained to you the elements the Government must prove beyond a reasonable doubt?
A Yes.
Q Has he explained to you the fines and imprisonment for which you may be subjecting yourself if the pleas are accepted?
A Yes.
Q Has he done that for each count?
A Yes.
*Id.* at 8–9.

September 1987 Letter, which explained the charges, the elements of each offense and the factual basis which the Government sought to establish for acceptance of the guilty plea. Cannistraro stated he had received the 18 September 1987 Letter and discussed it with his attorney. *Id.* at 10.[40]

After being informed of the penalties associated with each count of the First Indictment, Cannistraro was asked a series of questions relating to the elements of count one. Cannistraro responded "Yes" to each of these questions:

Q With regard to count one, do you understand that you're being charged with a conspiracy to commit securities fraud?

Q And you have discussed that with your attorney, correct?

Q He explained to you the elements of conspiracy?

Q The fact that a conspiracy, an agreement was willfully formed and existed at or about the time alleged in the indictment and that you willfully became a member of that agreement or that conspiracy and that you or one of your co-conspirators knowingly committed at least one overt act in furtherance of the conspiracy, and although it's not set forth in this letter, one of those overt acts must have occurred in this district, the District of New Jersey. Do you understand that?

Q You discussed that with your attorney. Has he explained that to you?

Q He explained to you what the substantive crime that your were alleged to have conspired to commit, that there is a violation of section 10(b) of the Securities Act. Do you understand that?

Q Did he go over Rule 10b–5 with you?

Q You read both of those in this letter [the 18 September 1987 Letter] on page two?

Q You talked about those with your attorney?

Q You understand all of that?

*Id.* at 14–15. Cannistraro was told the elements of a conspiracy and had a full understanding of the nature of the charges against him.

Cannistraro read, understood and reviewed with his attorney the contents of the 18 September 1987 Letter and the First Indictment. The 18 September 1987 Letter contains the text of Rule 10b–5 and section 10(b) of the 1934 Act. It also explains the substantive elements of the offenses under those statutes and the conduct Cannistraro was alleged to have committed in violation of those statutes, as well as the elements of the crimes charged in the other counts of the First Indictment.

Questions regarding counts two through nine of the First Indictment were also directed to Cannistraro. He indicated that he had read the 18 September 1987 Letter with respect to each of those counts, had understood and had discussed the elements and conduct of each of those crimes with his attorney. Cannistraro was frequently asked if he had any questions regarding the elements of those offenses and he responded negatively. *Id.* at 15–20. Following this questioning by the court, Cannistraro read his prepared statement in open court. *Id.* at 25–29.

The United States Attorney was then permitted to ask additional questions of

---

**40.** As previously noted, the 18 September 1987 Letter is a twelve page, single spaced letter which explains in detail, on a count-by-count basis, the elements of and penalties for each crime charged in the First Indictment. *See supra* note 4. Questioning by the court elicited the following responses from Cannistraro:

Q Before I go through each of these counts, did you review a copy of a letter dated September 18, 1987, which is addressed to me, which was copied to your attorneys, Mr. O'Connor and Mr. Gersten?

A I was able to review it yesterday afternoon.

Q Did you discuss it with your attorney?

A Yes.

Q Did your attorney explain it to you?

A Yes, your Honor.

Q Did he explain what the elements are as set forth for each count?

A Yes.

*Id.* at 9–10. The court then informed Cannistraro in detail of the penalties associated with each of the counts of the First Indictment. *Id.* at 11–13. As mentioned, the 18 September 1987 Letter sets forth in detail the elements of each crime and each count of the First Indictment and the penalties associated with them.

Cannistraro regarding the factual basis of the guilty plea. Warren read from the list of eighty-nine questions contained in the 18 September 1987 Letter and prepared at the direction of the court. *Id.* at 29–56. The court explained its reasons for having Warren prepare and read the questions regarding the factual basis as follows:

> THE COURT: The fact of the matter is, I don't know the circumstances of the case as intimately as [the defense attorney] or the United States knows them. I have followed this procedure, the procedure being requiring the United States Attorney to prepare a plea letter before a plea is entered. I've required the United States Attorney to list questions. He's doing this at my direction.
>
> MR. O'CONNOR: Fine. I thought that was probably true. I just didn't know.

*Id.* at 3–4.

The Rule 11 proceeding established that Cannistraro was well informed of the charges against him. As noted previously, Cannistraro is highly educated and capable of understanding the charges against him. He was repeatedly asked at the Rule 11 proceeding whether he had questions regarding the charges against him; he stated he did not. His after-the-fact claim that he did not understand those charges is a transparent attempt to manipulate the system to serve his own ends without regard to the absurdity of his position.

Cannistraro has not come close to establishing a substantial violation of his rights under Rule 11. Indeed, the statement prepared and read by Cannistraro at the Rule 11 proceeding demonstrates he had a full and complete understanding of his conduct and the charges against him. He has never made a credible assertion of his innocence throughout the three year period since he was first indicted. This claim, as the other claims made in support of this motion, is flagrant misuse of the system.

## CONCLUSION

Cannistraro's assertion that he pleaded guilty to conduct that is not criminal is unfounded. In addition, the claims of ineffective assistance of counsel and violation of Rule 11 have no basis in fact. Therefore, the Rule 32(d) motion of Cannistraro to withdraw his guilty plea is denied. Resentencing for Cannistraro in light of the supplemental record, *see Cannistraro,* 871 F.2d at 1217, is now scheduled for 23 April 1990 at 8:30 o'clock a.m.

The Government is to submit an appropriate form of order.